JUDGE BULLITT
delivered the opinion op the oodrt:
The appellee, Sam, was the slave of John Martin, who died in 1837, leaving a will, by which, after devising Sam and other slaves to his wife and children, he declared as follows: “ At the expiration of eight years after my death all the negroes above bequeathed are to be offered to the colonization society, (if they are of age,) to be transported to Liberia, and those that are not of age to continue to serve the persons to whom they are allotted until they come of age, that is to say, the boys until they are 21, and the girls until they are 18 years of age, when they are also to be offered to the colonization society to be transported to Liberia. None of them are to be forced to go. * * Those that do not go to Liberia are to continue to serve the persons to whom they are allotted until they are willing and do go. * * Phil, Sam and Joe to be hired out the seventh year after my death, and the money arising therefrom to be given to those that first go to Liberia, ten dollars apiece, if there should be so much, and the balance, if any, given to those that next go.”
Sam was allotted to Mrs. Taylor, who resided with her son-in-law, Morrison, who had the control of Sam.
In 1846, Sam, being of age, applied to Winn to purchase him, expressing a preference to remain in Kentucky as his slave, rather than go to Liberia, and his determination to go to Liberia if Mr. Morrison should refuse to sell him to Winn. Winn tried to buy him, but Morrison refused to sell for the sum offered. Sam then expressed to John Martin’s executors a *233 wish to go to Liberia, and they delivered him to the colonization society to be transported thither. The society soon afterward sent him, with other emigrants, to Liberia to be colonized, but he refused to become a citizen of the colony, and came back to New York on the vessel that took him out. Soon after reaching New York he caused a letter to be written to Winn, expressing his desire to return to Kentucky if Winn would buy him. In August, 1846, Winn purchased him, and he came to Kentucky and continued in the service of Winn until 1859, when he sued for his freedom and the value of his services. From a judgment in his favor Winn prosecutes this appeal.
The first question is, did Sam become entitled to freedom by going to Liberia? In our opinion he did not. '
We need not detail the evidence. We regard it as establishing, beyond a doubt, that. Sam never intended to become a Liberian colonist; that he announced his intention' to go to Liberia for the purpose of inducing Morison to sell him at the price that Winn was willing to give; that he left Kentucky hoping that Winn would buy him before the sailing of the vessel on which he was to embark at New Orleans, and intending, in that event, to return without leaving the United States; and that, being disappointed in that hope, he went to Liberia intending to return as soon as possible to the United States, hoping that this technical performance of the condition of the will would induce Morrison to sell him to Winn, and intending in that event to return to Kentucky.
The testator did not provide for the outfit and transportation of his slaves, but threw that burthen upon the society. We perceive no reason to believe that he meant to put the slaves to the trouble of going to Liberia, and the society to the expense of transporting them thither, for the purpose of giving them a right to freedom. Under the laws then in force they might have remained as freemen in Kentucky or in a Northern State, if he had so desired. But he did not so intend. He required them to remain in servitude whilst in Kentucky; and, to prevent them from leaving Kentucky avowedly for the purpose *234 of going to Liberia, but really for the purpose of settling in a Northern State, he required that any of them wishing to be free should be delivered “to the colonization society to be transported to Liberia.” Their freedom was not his sole nor his chief object. His chief object was to promote the scheme of colonization, which many then regarded as giving promise of a peaceful and happy solution of the problem of African slavery. The object of the- society was to colonize Liberia with negroes from the United States. The testator^ object was to furnish Liberian colonists. Sam, in going to Liberia with a concealed design to return immediately to the United States, did not comply with the will of the testator, but attempted to take an unfair advantage of bis benevolent purpose, and committed a fraud upon the colonization society instead of promoting its success according to the testator's intention.
If he had gone to Liberia in good faith, to dwell there, and • had become a colonist and thus acquired a right to freedom, • we do not suppose that he would have forfeited that right by afterward leaving the colony. But we need not decide that question now.
We do not regard the cases of John vs. Moreman et al, 8 B. Mon., 101, and Graham’s Ex’r. vs. Sam et al, 7 B. Mon., 405, cited by appellee’s counsel, as containing anything in conflict with this opinion. In the former case it was held that a slave, entitled to his freedom upon condition that he should go to Liberia, was entitled to the value of his services from the time of hivs electing to go. In the latter case the testator declared that if, within ten years, any of his slaves should “become willing and give themselves up to embark for Liberia, I do hereby emancipate all such for that purpose.” One of them, a female, within ten years, elected to go to Liberia; and it was held that her right to freedom related back to the death of the testator, so as to give freedom to her children born in the meantime, fn those cases it was assumed that there was an election, in good faith, to comply with the condition on which the right to freedom depended. Sam’s conduct leaves no room for such an assumption in this case.
*235 Slavery is prohibited by the laws of the State of New York. The evidence conduces to prove that Morrison was informed that Sam was in the city of New York soon after his arrival there. And it is contended that the failure of his owners, during a period of about three months, to make any effort to bring him away from New York, gave him a right to freedom. If so, his voluntary return to Kentucky would probably have deprived him of the right thus acquired. But, in our opinion, his stay in New York did not give him a right to freedom. He went and remained there, not with the consent of his owners, but as a fugitive slave. We are not aware of any case in which it has been held that the failure of a master, during three months or any other period, to attempt to capture a fugitive slave in a non-slaveholding State, entitles the slave to freedom. Nor do we perceive any reason to believe that Sam could have been found and.captured with such facility, that a failure to make the attempt raises a presumption that he remained there with the consent of his owners.
It is also contended that Winn agreed to emancipate Sam after realizing from his services the sum paid to Morrison. If such an agreement had been made with Sam it could not be enforced. But it is not proved that Winn so agreed either with Sam or Morrison. The fact that he made the purchase for much less than Sam now appears to have been worth does not conduce to prove such an agreement, since there were other obvious causes affecting the price. Nor would Morrison’s statement, that he did not consider Sam a slave, nor sell him as such, be sufficient to establish such an agreement, if conceded to be true. But the bill of sale, signed by Morrison and his wife and Mrs. Taylor, proves conclusively that they did sell him as a slave.
As Sam failed to allege that he now wishes to be placed in charge of the colonization society, to be transported to Liberia, he did not show himself entitled to any relief.
The judgment is reversed, and the cause remanded with directions to dismiss the petition.